667 So.2d 175 (1995)
STATE of Florida, Petitioner/Cross-Respondent,
v.
Miguel Angel VARGAS, Respondent/Cross-Petitioner.
No. 83935.
Supreme Court of Florida.
December 14, 1995.
Rehearing Denied February 2, 1996.
Robert A. Butterworth, Attorney General; James W. Rogers, Bureau Chief  Criminal Appeals; and Giselle Lylen Rivera and Thomas Crapps, Assistant Attorneys General, Tallahassee, for Petitioner/Cross-Respondent.
Wm. J. Sheppard of Sheppard and White, P.A., Jacksonville, and Michael R. Yokan, Jacksonville, for Respondent/Cross-Petitioner.
PER CURIAM.
We have for review Vargas v. State, 640 So.2d 1139 (Fla. 1st DCA 1994), in which the district court addressed four pretrial motions and certified the following as questions of great public importance:[1]

*176 WHETHER A SEARCH WARRANT FOR A BLOOD SAMPLE IS PROPERLY SERVED AND EXECUTED IN THE PRESENCE OF AN OFFICER WHO IS WITHIN THE TERRITORY NAMED IN THE SEARCH WARRANT, WHEN THE OFFICER WHO READS THE WARRANT TO THE ACCUSED, TRANSPORTS THE ACCUSED TO THE HOSPITAL FOR THE BLOOD TEST, AND TAKES CUSTODY OF THE BLOOD SAMPLE, IS NOT WITHIN THE SCOPE OF THE WARRANT.
Id. at 1142.
IS THE FDLE (FBI) METHOD OF CALCULATING POPULATION FREQUENCIES FOR PURPOSES OF DETERMINING THE POSSIBILITY THAT SOMEONE OTHER THAN DEFENDANT MATCHES THE DNA TAKEN FROM THE CRIME SCENE IN DNA PROFILING GENERALLY ACCEPTED IN THE RELEVANT SCIENTIFIC COMMUNITY FOR USE IN CRIMINAL TRIALS IN FLORIDA; IF NOT, IS A MORE CONSERVATIVE METHOD OF ESTIMATING POPULATION FREQUENCIES GENERALLY ACCEPTED IN THE RELEVANT SCIENTIFIC COMMUNITY FOR USE IN CRIMINAL TRIALS?
Id. at 1152. We have jurisdiction pursuant to article V, section 3(b)(4), of the Florida Constitution. We specifically address the certified question regarding the unauthorized execution of a search warrant. The claimed impropriety stems from the manner in which the warrant was executed. Because we find that the warrant was, indeed, improperly executed, we answer the first certified question in the negative. By resolving the first question in this manner, we need not address the second certified question.
The record reflects the following facts. Miguel Vargas was arrested on January 15, 1990, for attempting to burglarize an apartment. Noting substantial similarities between this attempt and previous unresolved burglaries and sexual batteries in which DNA evidence was retrieved from the crime scenes, the police obtained a warrant for the collection of a sample of blood from Vargas for a DNA comparison. The search warrant for the blood sample was directed to the sheriff and deputy sheriffs of Duval County. Officer Harris, a Clay County officer, found Vargas at Cecil Field in Duval County. At this point in time Officer Harris was unaccompanied by any Duval County officers. He executed the warrant by taking Vargas into his custody. Officer Harris, the Clay County deputy, then transported Vargas to meet Officer Baer, a Duval County sheriff's deputy. When the two officers met at Vargas' home in Duval County, Harris, the Clay County deputy, read the warrant to Vargas. Thereafter, Harris alone transported Vargas to the Duval County medical facility where the blood sample was taken. Baer, the Duval County deputy, drove separately and met them there. Baer remained outside the actual room in which the blood extraction was performed; Harris was inside the room. Harris, the Clay County deputy, instructed the medical technician to perform the blood extraction. Harris himself extracted hair samples from Vargas. Harris additionally took immediate and exclusive possession of the blood sample and signed the warrant inventory and receipt. Furthermore, Harris signed the search warrant return form testifying to the fact that he was the officer who executed the warrant.
Vargas filed a motion to suppress the blood evidence alleging that the warrant was improperly executed by Harris, an officer not named in the warrant. The trial court denied the motion to suppress. Vargas pleaded nolo contendere to a total of six counts of burglary and sexual battery. He retained, however, the right to appeal the motion to suppress. The State stipulated that the motion to suppress was dispositive of the entire case. The district court affirmed the trial court and certified the aforementioned question on the validity of the execution of this search warrant.
*177 The execution of warrants in Florida is governed in relevant part by section 933.08 of the Florida Statutes, which reads:
The search warrant shall in all cases be served by any of the officers mentioned in its direction, but by no other person except in aid of the officer requiring it, said officer being present and acting in its execution.
§ 933.08, Fla. Stat. (1993).
It is clear that Harris, the Clay County deputy, was the primary actor in the execution of the search warrant at issue. It is equally clear that Baer was involved for the purpose of validating the execution. We must confront the question of whether Baer's involvement was of a magnitude sufficient to satisfy the statute. We find Justice Anstead's well-reasoned opinion in Morris v. State, 622 So.2d 67 (Fla. 4th DCA), review denied, 630 So.2d 1101 (Fla. 1993), to be dispositive. In Morris, the district court disallowed a search of a physician's office by the Auditor General's staff. The staff was accompanied by an officer named in the warrant, but that officer waited in another room while the search took place. The lack of authorized supervision invalidated the search. Justice Anstead wrote:
Under the statute, the officer authorized by the warrant to conduct the search and seize the evidence designated must participate in or supervise the search even where he requires the assistance of others to do so. While the level of supervision and participation may vary depending on the circumstances, it is absolutely essential that the officer authorized be present when and where the search is conducted and carry out his responsibility to see that the warrant is properly executed and that its authorization is not exceeded. It is not enough that the authorized officer wait in another room while the search is conducted by others.
Id. at 69.
We read the statute to allow the recruitment, by an authorized officer, of assistance in performing search-related tasks that are numerous, repetitive, or burdensome. The statute surely does not endorse the vacation of basic duties by the authorized officer. In this case, as in Morris, the authorized officer remained idle while others executed the search. Mere physical proximity is not sufficient to satisfy the presence and activity requirements of the statute. When a warrant is properly executed, an objective observer should be able to distinguish between an authorized supervisor and that person's aide. The assignment, in this case, of the reading, recording, and custodial duties certainly makes the execution suspect, if not outright invalid. The compounding, and ultimately fatal, factor here is Baer's absence from the room where the blood sample was extracted. In this ruling, we do not allow form to triumph over substance. Any one of the mistakes made by Baer and Harris in this case would not necessarily invalidate the warrant. When the circumstances are viewed as a whole, however, the natural conclusion is that Baer was not present and active in the sense required by the statute. In sum, we refuse to allow an authorized officer to assign every basic duty involved in the execution of a warrant. To do so would render the relevant statute meaningless.
Accordingly, we find that this motion to suppress should have been granted. We again note that the State has stipulated that such a ruling is dispositive. We therefore answer the first certified question in the negative, quash the district court's order, and vacate the convictions in this case. Our ruling on the first certified question makes it unnecessary for us to address the second certified question.
It is so ordered.
SHAW, KOGAN, HARDING and ANSTEAD, JJ., concur.
GRIMES, C.J., concurs with an opinion.
OVERTON, J., dissents with an opinion, in which WELLS, J., concurs in part.
WELLS, J., dissents with an opinion.
GRIMES, Chief Justice, concurring.
While our ruling may appear to be unduly technical, I am convinced that the law requires the motion to suppress to be granted. However, I know of nothing to keep the *178 State from obtaining a new search warrant and having it properly served.
OVERTON, Justice, dissenting.
I dissent. I would not suppress the blood sample taken from Vargas under the circumstances of this case. This is not a constitutional search-and-seizure question under article I, section 12, Florida Constitution, or the Fourth Amendment to the United States Constitution. It is strictly a question of compliance with the statutory requirements for executing a search warrant. The critical issue emphasized by the majority is whether section 933.08, Florida Statutes (1993), requires an authorized officer to actually observe a medical procedure in order to be considered present. In this case the authorized officer, who was present at the medical facility for the sole purpose of executing the warrant, was just a few feet away in an adjoining room when the procedure was performed. Had he been in the room with the suspect, he could have done nothing but observe. He certainly could not provide guidance to a medical technician trained in a specialized field. This is where the instant case differs from Morris v. State, 622 So.2d 67 (Fla. 4th DCA), review denied, 630 So.2d 1101 (Fla. 1993), the case relied upon by the majority as being dispositive. In Morris, the authorized officer sat in an adjoining room while staff members from the Auditor General's office performed an extensive search of a physician's files. Clearly, the authorized officer should have supervised that search to ensure that the scope of the warrant was not exceeded. A medical procedure, by its very nature, is not subject to the same type of strict supervision because law enforcement officers are not trained in specialized medical techniques. While the prosecution must always establish a chain of custody, I do not believe it necessarily follows that the authorized officer must witness the medical procedure in order to satisfy the statutory requirements. Thus, I would find that Morris is not applicable.
As noted, no violation of the Fourth Amendment to the United States Constitution or of article I, section 12, of the Florida Constitution has been established. Even if it may be argued that there was not full technical compliance with the present statute, I would find that there was substantial compliance with the statute and any violation of the statutory directions would still fail to prejudice the rights of this defendant under these circumstances. Consequently, I would reach the second certified question, which reads as follows:
IS THE FDLE (FBI) METHOD OF CALCULATING POPULATION FREQUENCIES FOR PURPOSES OF DETERMINING THE POSSIBILITY THAT SOMEONE OTHER THAN DEFENDANT MATCHES THE DNA TAKEN FROM THE CRIME SCENE IN DNA PROFILING GENERALLY ACCEPTED IN THE RELEVANT SCIENTIFIC COMMUNITY FOR USE IN CRIMINAL TRIALS IN FLORIDA; IF NOT, IS A MORE CONSERVATIVE METHOD OF ESTIMATING POPULATION FREQUENCIES GENERALLY ACCEPTED IN THE RELEVANT SCIENTIFIC COMMUNITY FOR USE IN CRIMINAL TRIALS?
Vargas v. State, 640 So.2d 1139, 1152 (Fla. 1st DCA 1994).
This question is difficult to answer at the current time. There are two tests presently being used by courts in this country to determine the admissibility of a new type of scientific evidence. The first is the established Frye test,[2] which requires that, before new scientific evidence is admissible, there must be testimony establishing that such new scientific principle or discovery is "sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye v. United States, 293 F. 1013, 1014 (D.C. Cir.1923). The second approach, now utilized in the federal courts and developed, in part, as a result of the United States Supreme Court's decision in Daubert v. Merrell Dow Pharmaceuticals, Inc., ___ U.S. ___, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), is the helpfulness or relevancy test based on Federal Evidence Rule 702. Under this test, various factors are taken into account including *179 the general acceptance of the expert's theory. However, the ultimate admissibility decision does not turn on the theory having general acceptance in the scientific community. In Florida, we have made clear that the Frye test must be satisfied prior to the admission of new scientific evidence. See Hayes v. State, 660 So.2d 257 (Fla. 1995); Ramirez v. State, 651 So.2d 1164 (Fla. 1995); Stokes v. State, 548 So.2d 188 (Fla. 1989). Given our clear policy statement that Frye applies in Florida, I would refuse to accept the State's contention that Frye should apply only to the threshold analysis of DNA testing in general. Under the State's approach, a prosecutor would have to establish only that DNA theory and techniques are accepted in general; the reliability of DNA probability calculations would then be reviewed under either the federal relevancy standard or as a question of weight for the jury. Such a deviation is clearly contrary to both Ramirez and Hayes. I would reject any effort to ease the standard of admissibility for this crucial step in the overall DNA process. Florida has established a strong policy of using the Frye test in admissibility determinations for new scientific evidence, and I would envision substantial confusion in the courts if we were to sanction the use of both the Frye test and the federal relevancy test as part of the process to determine the admissibility of DNA evidence. It should be one or the other, and this Court has chosen the Frye test.
Examining the FDLE (FBI) probability calculation techniques in light of the Frye standard, it is impossible to ignore that the National Research Council, established by the National Academy of Sciences, has been critical of the data base utilized by the FBI. As noted by the district court in its opinion, a California court determined that evidence of DNA probability calculations using FBI data bases is inadmissible under the Frye test. The California court explained that there was a "bitter and raging" debate among population geneticists concerning the reliability of the process used in these calculations and concluded, because of the NRC report, there was a lack of general acceptance. People v. Wallace, 14 Cal. App. 4th 651, 17 Cal. Rptr.2d 721 (Cal.Ct.App. 1993).
Unfortunately, the scientific community does not seem to have crystallized its support behind the NRC Report either. One recent author made this statement:
Recent developments have shown that general acceptance may not be easily achieved. It appears that some proponents of DNA analysis, rather than attempting to come to terms with the NRC Report or some other compromise on statistical calculation, have taken the offensive and attacked the Report's proposed new methods of statistical calculation as unsound.
Rory Sherman, New Scrutiny for DNA Testing, Nat'l L.J. Oct. 18, 1993 at 3. I hope and expect that these differences will be resolved within the scientific community in the near future. The National Research Council is preparing to issue a new report on DNA technology by May, 1996.
In the instant case, I would find that certain evidence proffered by the defendant, going directly to the reliability of the DNA probability calculations, was improperly excluded by the trial court. The exclusion of this evidence, together with what I consider to be an incorrect application of the Frye test by the trial court, dictates that a new evidentiary hearing be held as to the admissibility of DNA probability calculations. In my view, there was no proper factual determination on the merits of this question. Without a proper factual finding from the trial court with respect to the scientific community's acceptance of probability calculation methods, we cannot answer the second certified question posed by the district court.
In summary, I would approve the denial of the motion to suppress and, consequently, answer the first certified question in the affirmative. I would, however, decline to answer the second certified question, and I would direct that a new evidentiary hearing be held concerning the admissibility of DNA test results produced with the blood sample. The blood has not changed. It is the DNA probability calculations that are the issue. A new hearing will allow the trial court to consider any changes that have occurred in the scientific community since the original proceeding. If properly presented, the calculation methods in this case may well be admissible under a Frye analysis. If the trial court finds that the calculation methods *180 do not satisfy the Frye test, then the DNA evidence is inadmissible and, therefore, by virtue of the State's stipulation that the issue is dispositive, Vargas must be discharged.
Finally, I must respectfully disagree with the concurring opinion of the Chief Justice. The State stipulated as to the dispositive nature of the four motions in this case. Vargas entered his plea reserving the right to appeal the trial court's ruling on those four motions. This Court stated in Brown v. State, 367 So.2d 616, 620-21 (Fla. 1979):
The exact points at which jeopardy will "attach" are relatively clear. The United States Supreme Court has held that jeopardy attaches in a jury case when the jury is impaneled and sworn, and in a non-jury trial when the trial judge begins to hear evidence. Serfass v. United States, 420 U.S. 377, 388, 95 S.Ct. 1055, 1062-63, 43 L.Ed.2d 265 (1975). We have held that jeopardy attaches on an unconditional guilty plea when the plea is or should have been accepted, and on a conditional plea which is accepted on conditions favorable to the defendant.
(Footnotes omitted.)
Clearly jeopardy attached in this case. I recognize that there is not a violation of the double jeopardy clause every time a conviction is reversed after jeopardy has attached. However, the stipulation by the State as to the dispositive nature of the issues submitted by the certified questions raises a serious double jeopardy question in this case that may bar further prosecution of Vargas. This issue has been neither addressed nor resolved by the majority opinion. Because the issue was not briefed or argued, the comments in both this dissent and the concurring opinion are not dispositive of the double jeopardy issue. It is, however, an important issue because of the majority's holding.
WELLS, J., concurs in part.
WELLS, Justice, dissenting.
I join in the dissent of Justice Overton except for that portion which discusses Chief Justice Grimes' concurring opinion.
NOTES
[1] The trial court denied Miguel Vargas' three motions to suppress and one motion in limine. The district court affirmed the three suppression rulings, certifying the third as a question of great public importance. The district court vacated the order on the motion in limine and remanded. The matter addressed by the motion in limine was also certified as a question of great public importance. The State noticed the certified question regarding the motion in limine. Vargas cross-noticed the first certified question.
[2] Frye v. United States, 293 F. 1013 (D.C. Cir.1923).