654 So.2d 184 (1995)
Robert James BRIM, Appellant,
v.
STATE of Florida, Appellee.
Nos. 93-00860, 93-00863 and 93-00864.
District Court of Appeal of Florida, Second District.
April 12, 1995.
James Marion Moorman, Public Defender, and Jennifer Y. Fogle, Asst. Public Defender, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Dale E. Tarpley, Asst. Atty. Gen., Tampa, for appellee.
CAMPBELL, Judge.
The primary issue presented for our consideration in this appeal is whether, in considering a request for admission of the statistical consequences of the analysis of matching DNA samples, a court must exclude all or part of that analysis if the court is presented with evidence of two differing but generally accepted views within the scientific community concerning the proper population frequency statistics to be applied. These population frequency statistics are critical because the statistics, when applied to the DNA test results, are the genesis of the extremely persuasive probability estimates (one in a million, for example) that are commonly associated with DNA testing. Our extensive review of the emerging law in this area leads us to conclude that the existence of two differing views on a statistical frequency approach neither renders the DNA analysis itself inadmissible, nor renders those differing views inadmissible so long as each view or approach is shown to be generally accepted by a typical cross-section of the relevant scientific community. That having been the case here, we affirm.
Appellant Brim challenges his convictions and sentences for various offenses arising out of three separate occasions in which he broke *185 into women's homes. In two of the three cases, appellant was convicted of sexually battering the women whose homes he entered (Case Nos. 93-00860 and 93-00863). In one of those two cases, he was also charged with armed burglary of a dwelling and robbery (Case No. 93-00860). In the other of those two cases, he was also charged with burglary of a dwelling with assault or battery and with robbery (Case No. 93-00863). In 93-00860, appellant pled nolo, reserving the right to appeal the denial of his motion in limine and motion to suppress. In the third case, appellant pled no contest to misdemeanor battery and to burglary of a dwelling with an assault. Appellant's sentencing issues will be considered later in this opinion.
The evidence against appellant in the first two cases consisted primarily of DNA analysis and blood and saliva samples. He challenges the admission of both. It is appellant's position that the DNA population frequency statistics did not meet the test for admission of novel scientific evidence established in Frye v. United States, 293 F. 1013 (D.C. Cir.1923), which requires that novel scientific evidence be generally accepted in the relevant scientific community in order to be admissible. As the Frye court stated, "the evidential force of the principle must be recognized." Appellant maintains that because there is currently a debate concerning the proper statistical population base to use in any given case, the statistical frequency figures are not "generally accepted" in the relevant scientific community and, accordingly, were not properly admitted.
In analyzing this problem, a rudimentary understanding of the DNA testing process is necessary. DNA testing first begins with the actual chemical process which separates out polymorphisms (genetic areas of difference among individuals) and readies them for analysis. The second step is that in which the sample DNA molecule is compared or matched to the defendant's DNA sample.
It is the third segment of the process, or the application of a statistical population frequency analysis, that is at issue here. This is where the statistical significance of the match is determined. For example, the probability of the match occurring randomly might be determined to be one in a million or one in 300 million. Since it is the application of the population frequency statistics that makes the DNA test results so persuasive, admission of these statistics must be carefully scrutinized to avoid undue prejudice to the defendant. It is in this area that the applicability of the Frye test has become most confused.
In arriving at the statistical significance of the match, the field of human population genetics is consulted. The statistical significance is measured by the frequency with which a particular DNA pattern would be observed in a sample population. The DNA testing here was performed by the Florida Department of Law Enforcement, based on Federal Bureau of Investigation (FBI) procedures. The FBI has sample populations for Caucasians, Blacks, Asians and Hispanics. There is currently a dispute in applying these probabilities to the DNA test results because it is thought that certain population groups may not intermarry with the same frequency as other population groups, or may intermarry with differing frequencies in different locales, thus producing skewed results. This concern led the National Research Council's Committee on DNA Technology to recommend that the "modified ceiling principle" be used in forensic cases. The modified ceiling principle is thought to produce more conservative results than the FBI procedure. In the instant case, the FBI procedure generated a probability that only one out of 1.4 billion whites and one out of 2.5 million blacks would share the DNA code with the perpetrator of the offense. The modified ceiling principle indicated that only one in just over 9,000 individuals would share the perpetrator's genetic DNA code.
The state argues that the DNA probability statistics are generally accepted despite the existence of the dispute because the theories presented are both generally accepted, were both presented to the jury, and the jury was allowed to assess their weight.
We begin our analysis with the observation that the rule in Frye was established as a reliability test, on the theory that once a scientific supposition is generally accepted *186 among the relevant scientists, it is more likely to be reliable. The Frye court emphasized that it is the scientific principle or discovery from which deductions are made that must be generally accepted. The existence of one reliable theory or deduction from underlying reliable scientific evidence does not necessarily exclude the existence of another reliable deduction or theory. The Frye court, in its brief opinion, stated:
Just when a scientific principle or discovery crosses the line between the experimental and demonstrable stages is difficult to define. Somewhere in this twilight zone the evidential force of the principle must be recognized, and while courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs.

293 F. at 1014 (emphasis supplied). Given the very nature of scientific and technological advances, it is quite possible that there will be, at any one time, more than one deduction that can be made from a generally accepted theory.
Inherent in the scientific method is "testing and confirmation of [] hypotheses ..." a never-ending process. As Albert Einstein said, "One reason why mathematics enjoys special esteem, above all other sciences, is that its laws are absolutely certain and indisputable, while those of all other sciences are to some extent debatable... ." (citations omitted). If the Kelly requirements [the California version of Frye)] were met only if there were no debate on a subject, even Copernicus's theory of a sun-centered solar system could not be mentioned in a court of law. The flat earth society would carry the day. Indeed, no scientific advance has yet been developed that cannot be questioned or debated. For this reason, evidentiary rules do not require absolute certainty or unanimity.
People v. Soto, 30 Cal. App.4th 340, 357, 35 Cal. Rptr.2d 846, 856 (Cal. App.4th Dist. 1994), modified on rehearing (Cal. App.4th Dist. Dec. 22, 1994) (citations omitted).
Accordingly, we do not read Frye as limiting the admissible deductions that can be made from reliable scientific evidence to a single "generally accepted" deduction or theory. There is nothing in Frye to suggest that. In fact the opposite is true as reflected in the Frye quote above. In this regard, we are influenced by Judge Orfinger's analysis in Andrews v. State, 533 So.2d 841 (Fla. 5th DCA 1988), rev. denied, 542 So.2d 1332 (Fla. 1989). Although the issue in Andrews was not the precise issue before this court, we agree with Judge Orfinger that the "relevancy approach" is the preferred approach when faced with the admissibility of the comparison techniques or deductions based upon the generally accepted scientific DNA analysis. The issue presented to us (as it is in most cases where admissibility of DNA evidence is contested) is exactly the same as our supreme court considered in Bundy v. State, 455 So.2d 330 (Fla. 1984), cert. denied, 476 U.S. 1109, 106 S.Ct. 1958, 90 L.Ed.2d 366 (1986) [Bundy I], in considering the admissibility of testimony of dental experts who compared "bite marks" on a victim with models of the defendant Bundy's teeth. There, the supreme court stated:
Bundy also challenges the trial court's ruling that permitted the state to present the testimony of dental experts who analyzed the bite inflicted on murder victim Lisa Levy and compared it to the models of appellant's teeth. Before trial the defense moved to exclude such evidence on the ground that the comparison techniques were not reliable. Dental experts for the state and the defense testified at the motion hearing... .
The trial court found that the science of odontology, which is based on the discovery that the characteristics of individual human dentition are highly unique, is generally recognized by scientists in the relevant fields and therefore is an acceptable foundation for the admissibility of expert opinions into evidence. The court in effect ruled that since the proffered evidence met this criterion the details of the comparison techniques were matters of credibility and *187 weight of the evidence for the jury to determine. .. .
Appellant contends that the bite mark comparison evidence and expert testimony should not have been admitted into evidence because it was not shown that the comparison techniques were reliable and that accepted standards of comparison were used... .
The evidence in question is based on the examination of impressions made by human teeth and their comparison with models of known human teeth for the purpose of determining whether the impressions were or probably were or could have been made by a particular individual. Bite mark comparison evidence differs from many other kinds of scientific evidence such as blood tests, "breathalyzer" tests, and radar (as well as from inadmissible techniques such as the polygraph and voice-print analyses) in that these various techniques involve total reliance on scientific interpretation to establish a question of fact. With bite marks evidence, on the other hand, the jury is able to see the comparison for itself by looking directly at the physical evidence in the form of photographs and models. People v. Slone, 76 Cal. App.3d 611, 143 Cal. Rptr. 61 (Cal.Ct. App. 1978); People v. Marx, 54 Cal. App.3d 100, 126 Cal. Rptr. 350 (Cal.Ct.App. 1975).
As the trial court found, the basis for the comparison testimony  that the science of odontology makes such comparison possible due to the significant uniqueness of individual dental characteristics  has been adequately established. Appellant does not contest this supposition. Forensic odontological identification techniques are merely an application of this established science to a particular problem. People v. Marx. The technique is similar to hair comparison evidence, which is admissible even though it does not result in identifications of absolute certainty as fingerprints do. Jent v. State, 408 So.2d 1024 (Fla. 1981), cert. denied, 457 U.S. 1111, 102 S.Ct. 2916, 73 L.Ed.2d 1322 (1982); Peek v. State, 395 So.2d 492 (Fla. 1980), cert. denied, 451 U.S. 964, 101 S.Ct. 2036, 68 L.Ed.2d 342 (1981). Its probative value to the case is for the trier of fact to determine.

The trial court also found that the comparison techniques actually used in this case were reliable enough to allow the experts to present their materials and their conclusions to the jury. Bundy has presented no basis for finding that the trial judge abused his discretion in doing so.
455 So.2d at 348-349 (emphasis supplied).
Accordingly, we hold that the trial court was correct in finding that the evidence presented here satisfies the Frye test. Where there are two differing, but both generally accepted deductions that can be made from generally accepted scientific evidence, they may both be admitted provided that the underlying scientific evidence satisfies Frye. The existence of such differing views or deductions does not require the exclusion of DNA evidence entirely. To do so would be to throw the proverbial "baby out with the bath water."
While we find that the evidence here meets the Frye test, we express our concern with the application of the Frye test in some cases. It may be that a general relevancy test, one that does not limit the admissible scientific evidence to that reflected by one unanimous view, would be a more preferable, and perhaps realistic, test in such situations.
We recognize that our conclusion that DNA population statistics need not meet the stringent Frye test conflicts with that of our sister court in Vargas v. State, 640 So.2d 1139 (Fla. 1st DCA 1994). We are not persuaded by that decision. We, accordingly, certify conflict. We do not believe that the Florida Supreme Court intended, as the Vargas court announced, that Flanagan v. State, 625 So.2d 827 (Fla. 1993), addressed the precise issue before us.
We have an additional concern regarding application of the Frye test due to recent statements of our supreme court in Ramirez v. State, 651 So.2d 1164 (Fla. 1995). There, the supreme court provided an excellent analysis of the procedure for admitting into evidence expert testimony based on new or novel scientific evidence. The court outlined the procedure as follows:

*188 The admission into evidence of expert opinion testimony concerning a new or novel scientific principle is a four-step process. See generally Charles W. Ehrhardt, Florida Evidence § 702.1 (1992 Edition); Michael H. Graham, Handbook of Florida Evidence § 90.702 (1987 Edition). First, the trial judge must determine whether such expert testimony will assist the jury in understanding the evidence or in determining a fact in issue. § 90.702, Fla. Stat. (1993) (adopted by the Florida Supreme Court in In re Florida Evidence Code, 372 So.2d 1369 (Fla. 1979)). Second, the trial judge must decide whether the expert's testimony is based on a scientific principle or discovery that is "sufficiently established to have gained general acceptance in the particular field in which it belongs." Frye v. United States, 293 F. 1013, 1014 (D.C. Cir.1923). This standard, commonly referred to as the "Frye test," was expressly adopted by this Court in Bundy v. State, 471 So.2d 9, 18 (Fla. 1985), cert. denied, 479 U.S. 894, 107 S.Ct. 295, 93 L.Ed.2d 269 (1986), and Stokes v. State, 548 So.2d 188, 195 (Fla. 1989). The third step in the process is for the trial judge to determine whether a particular witness is qualified as an expert to present opinion testimony on the subject in issue. § 90.702, Fla. Stat. (1993). All three of these initial steps are decisions to be made by the trial judge alone. See Johnson v. State, 393 So.2d 1069, 1072 (Fla. 1980), cert. denied, 454 U.S. 882, 102 S.Ct. 364, 70 L.Ed.2d 191 (1981); Rose v. State, 506 So.2d 467 (Fla. 1st DCA), review denied, 513 So.2d 1063 (Fla. 1987). Fourth, the judge may then allow the expert to render an opinion on the subject of his or her expertise, and it is then up to the jury to determine the credibility of the expert's opinion, which it may either accept or reject. Wuornos v. State, 644 So.2d 1000 (Fla. 1994) ("[T]he finder of fact is not necessarily required to accept [expert] testimony."); Walls v. State, 641 So.2d 381, 390 (Fla. 1994) ("[E]xpert opinion testimony [is] not necessarily binding even if uncontroverted.").
The second step, concerning whether to allow expert opinion testimony on a new or novel subject, is especially important to the process. As Professor Ehrhardt has explained:
When a novel type of opinion is offered, the proffering party must demonstrate the requirements of scientific acceptance and reliability. The most widely adopted test has been that of Frye v. United States which involved the admissibility of an early polygraph. The court held the evidence inadmissible because the underlying scientific principle was not "sufficiently established to have gained general acceptance in the particular field in which it belongs."
Ehrhardt, supra, § 702.2 (footnotes omitted). The principal inquiry under the Frye test is whether the scientific theory or discovery from which an expert derives an opinion is reliable.
651 So.2d at 1166-67.
We conclude that the issue before us, the admissibility of expert testimony using comparison statistics to provide evidence regarding the relevant force of a generally accepted scientific procedure, is encompassed in steps three and four of the analysis in Ramirez and does not require application of the Frye test to those steps. Further language in the Ramirez opinion causes us concern, however. That language is as follows:
In utilizing the Frye test, the burden is on the proponent of the evidence to prove the general acceptance of both the underlying scientific principle and the testing procedures used to apply that principle to the facts of the case at hand. The trial judge has the sole responsibility to determine this question. The general acceptance under the Frye test must be established by a preponderance of the evidence.
651 So.2d at 1168 (emphasis supplied.) We construe this language not to apply to the issue before us for to do so, we conclude, would conflict with the holding in Bundy I, on which we have relied.
We now turn to appellant's challenge to the admission of blood and saliva samples, arguing that the detective did not have probable cause to request same. However, the detective had possession of the blood and saliva samples pursuant to an earlier investigation. Under State v. Mejia, 579 So.2d 766 *189 (Fla. 3d DCA 1991), any privacy interest appellant might have had in his blood sample had dissipated, and no warrant was required to submit the sample for a different investigation.
Appellant has also challenged his sentences. We find error only in regard to the habitual offender sentence imposed in regard to Count III (Case No. 93-00860), a life felony. That sentence must be corrected. See Burdick v. State, 594 So.2d 267 (Fla. 1992); Johnson v. State, 568 So.2d 519, 520 (Fla. 1st DCA 1990). The court also improperly ordered the habitual offender sentences in 93-00863 to be served consecutively, which is improper under Hale v. State, 630 So.2d 521 (Fla. 1993). Accordingly, we direct the trial court on remand to correct the sentences as specified herein and vacate the consecutive sentencing and replace it with concurrent sentencing.
Finally, we reach appellant's last issue, his challenge as to his sentencing in 93-00864, an Anders appeal. As observed by counsel, the court orally declared appellant a habitual offender on all cases, including his misdemeanor conviction. We remand for correction of the sentencing order in that case to eliminate the habitual felony offender designation from the misdemeanor sentence.
Appellant's convictions are affirmed and the cases remanded for correction of his sentences in accordance herewith.
FRANK, C.J., and FULMER, J., concur.